Barry I. Levy, Esq.
Joshua D. Smith, Esq.
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY CO.,                    Docket No.:_____ (      )

                                          Plaintiffs,

                    -against-                                                **Plaintiff Demands**
                                                                            **a Trial by Jury**
MIKHAIL STRUT, M.D. a/k/a MIKHAIL STRUTSOVSKIY,
M.D., RES PHYSICAL MEDICINE & REHABILITATION
SERVICES, P.C., and JOHN BAUERS, M.D.,

                                          Defendants.
-------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.       This action seeks to recover more than $1,603,000.00 that Defendants Mikhail

Strut, M.D. a/k/a Mikhail Strutsovskiy, M.D ("Strut"), John Bauers, M.D. ("Bauers"), and RES

Physical Medicine & Rehabilitation Services, P.C. ("RES") wrongfully obtained from GEICO by

submitting thousands of fraudulent no-fault insurance charges relating to medically unnecessary,

1

illusory, and otherwise non-reimbursable healthcare services, including purported initial examinations, follow-up examinations, extracorporeal shockwave therapy, ligament laxity testing, psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services (collectively the "Fraudulent Services") allegedly provided to New York automobile accident victims who were eligible for coverage under GEICO automobile insurance policies ("Insureds"). As set forth more fully herein, the Defendants misrepresented the nature, extent, and results of the Fraudulent Services, and whether they had been legitimately performed in the first instance.

2.      In addition, GEICO seeks a declaration that it is not obligated to pay more than $75,000.00 in pending no-fault insurance claims submitted by or on behalf of Defendants because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

3.      As discussed below, the Defendants at all times have known that:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed through RES to GEICO.

5.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

6.      The Defendants' most recent fraudulent scheme began in 2021 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages exceeding $1,603,000.00.

## THE PARTIES

## I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.     Defendants

## A.     Strut

8.      Strut resides in and is a citizen of New York. Strut owns and controls RES, and purported to perform many of the Fraudulent Services.

9.      Strut is a convicted felon who nonetheless has been licensed to practice medicine in New York since November 14, 2008.

10.     In July 2009, in the United States District Court for the Western District of New York, Strut was convicted of a felony after pleading guilty to one count of Aiding and Abetting a False Statement Related to Healthcare Fraud in violation of 18 U.S.C. § 1035(a)(2).

11.     The information alleged that, from January 2003 through September 2004, when Strut was a licensed physical therapist, Strut knowingly and willfully made materially false and

fraudulent statements and misrepresentations in connection with the delivery of healthcare services. In particular, Strut caused Medicare claim forms to be submitted for reimbursement in which he falsely represented that he had rendered treatment to Medicare beneficiaries. In his plea agreement, Strut admitted to submitting reimbursement claim forms to the Medicare program which falsely certified that healthcare services provided to program beneficiaries was medically necessary. Strut further admitted to certifying that he personally provided services to beneficiaries when, in fact, he had not. Strut also admitted that his criminal activities were part of a larger scheme devised by his former employer to defraud the Medicare program.

12.     In his plea agreement, Strut also admitted facts demonstrating that the fraudulent Medicare claims were submitted through a physical therapy professional corporation that – while nominally owned on paper by Strut – actually was secretly and unlawfully owned and controlled by unlicensed non-professionals.

13.     The Court accepted Strut's guilty plea, sentenced him to 10 months of house arrest, three years' probation, and ordered him to pay $131,138.00 in restitution to the Medicare program.

14.     Following Strut's felony conviction, the New York State Board for Professional Medical Conduct (the "State Board") placed Strut on three years' probation and fined him, as well.

15.     In addition, the Centers for Medicare & Medicaid Services ("CMS") revoked Strut's billing privileges following his felony conviction. Strut challenged this revocation, but it was upheld. When challenging CMS's decision, Strut admitted that the Medicare fraud scheme that resulted in his conviction was controlled by the "Russian Mafia".

16.     Following his felony conviction, Strut legally changed his name from Mikhail Strutsovskiy to Mikhail Strut, in an attempt to conceal his criminal past and professional disciplinary history from his patients and others.

4

17.     Upon information and belief, Strut's criminal and professional disciplinary history, which can be located by prospective patients, employers, and referral sources via internet searches, has made it virtually impossible for Strut to earn a living as a legitimate physician, and contributed to his motive to engage in the fraudulent scheme described herein.

**B.     Bauers**

18.     Bauers resides in and is a citizen of New York. Bauers was licensed as a physician in New York on October 7, 1977. Bauers is associated with RES and purported to perform many of the Fraudulent Services.

**C.     RES**

19.     Defendant RES is a New York medical professional corporation with its principal place of business in New York, through which the Fraudulent Services were provided and billed to insurance companies, including GEICO. RES was incorporated in New York on or about January 31, 2011, and is owned and controlled by Strut.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Western District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

22.     GEICO underwrites automobile insurance in New York and New Jersey.

23.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

24.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(the "No-Fault Laws"), automobile insurers are required to provide no-fault insurance ("Personal Injury Protection" or "PIP") benefits ("PIP Benefits") to Insureds.

25.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

26.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

27.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

28.     In the alternative, in New York a healthcare services provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

29.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

(emphasis added).

30.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

31.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

32.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

33.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified

by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   The Prior Strut Actions and the Antecedents of the Defendants' Fraudulent Scheme

34.     Strut has a history of operating RES as a fraudulent medical practice and using RES as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO and other insurers.

35.     In November 2009, four months after his felony conviction and while he was still under house arrest, Strut filed for bankruptcy. In the schedules accompanying his bankruptcy petition, Strut listed only about $21,000.00 in assets – chiefly attributable to a tax refund – against approximately $420,000.00 in debts.

36.     While some of these debts were attributable to student loans, many of the debts reflected Strut's desire to live a lifestyle that was far beyond his means. For instance, the debts listed on Strut's bankruptcy schedules included more than $200,000.00 in consumer debt that Strut compiled on 13 separate credit cards.

37.     Though Strut was discharged in bankruptcy in February 2010, and was released from house arrest in about May 2010, these events did not alleviate his financial distress.

38.     Although – following his release from house arrest – Strut's probationary medical license technically allowed him to practice medicine, he was faced with a series of obstacles to the lucrative medical practice and lifestyle he desired.

39.     For example, because Strut was barred from billing under the Medicare system, he was denied access to a large patient population as well as the largest national payor network. In addition, medical malpractice insurance carriers refused to provide Strut with malpractice

insurance because the State Board had placed him on probation. Most private insurers will not authorize treatment provided by an uninsured physician, which severely limited the scope of Strut's practice. Moreover, following his criminal conviction, Strut was referred to prominently in the Buffalo News as a "scam artist" and "unscrupulous". Collectively, these factors limited Strut's ability to generate the money necessary to support the lifestyle he desired through legitimate means.

40.     Accordingly, in or about June 2010, Strut created a fraudulent medical practice in the Buffalo, New York area, and used the practice to submit fraudulent no-fault insurance billing to GEICO and other insurers.

41.     Initially, Strut operated the medical practice as an unincorporated sole proprietorship. However, on or about January 31, 2011, Strut incorporated RES, and thereafter operated his fraudulent medical practice through RES.

## A.     The First Strut Action

42.     In April 2012, GEICO sued Strut and RES – among others – in an action entitled Government Employees Insurance Co., et al. v. Strutsovskiy, et al., W.D.N.Y. Case No. 1:12-cv-00330-LJV-HKS (the "First Strut Action").

43.     In the First Strut Action, GEICO alleged – among other things – that Strut and RES submitted a massive amount of fraudulent no-fault insurance billing that misrepresented the medical necessity of the underlying healthcare services and, in many cases, that the underlying services actually were performed in the first instance.

44.     In the First Strut Action, GEICO also alleged that Strut and RES incentivized Insureds to continue presenting for medically unnecessary "treatment" by prescribing massive

amounts of medically-unnecessary narcotics and other habit-forming drugs to the Insureds, oftentimes despite clear indications that the drugs were being abused or diverted.

45.     In October 2017, the Court in the First Strut Action denied Strut and RES's motion for summary judgment in substantive part, and granted GEICO's motion for a preliminary injunction to stay Strut and RES's attempts to collect on their allegedly fraudulent no-fault insurance billing.

46.     Soon thereafter, in November 2017, GEICO, Strut, and RES reached a settlement in the First Strut Action.

**B.     The Second Strut Action**

47.     In June 2019, GEICO again sued Strut, RES, and one of their associates, Cheryle Hart, M.D. ("Hart"), in an action entitled Government Employees Insurance Co., et al. v. Strutsovskiy, et al., W.D.N.Y. Case No. 1:19-cv-00728-JLS-MWP (the "Second Strut Action").

48.     In the Second Strut Action, GEICO alleged – among other things – that following the settlement in the First Strut Action, Strut, Hart, and RES submitted a massive amount of fraudulent no-fault insurance billing that misrepresented the medical necessity of the underlying healthcare services and, in many cases, that the underlying services actually were performed in the first instance.

49.     In the Second Strut Action, GEICO also alleged that Strut, Hart, and RES incentivized Insureds to continue presenting for medically unnecessary "treatment" by prescribing massive amounts of medically unnecessary narcotics and other habit forming drugs to the Insureds, oftentimes despite clear indications that the drugs were being abused or diverted.

50.     In April 2020, the Court in the Second Strut Action denied Strut, Hart, and RES's motion to dismiss and granted GEICO's motion for a preliminary injunction to stay Strut, Hart, and RES's attempts to collect on their allegedly fraudulent no-fault insurance billing.

51.     Thereafter, in June 2021, GEICO, Strut, and RES reached a settlement in the Second Strut Action.

52.     However, as set forth more fully below, following the settlement in the Second Strut Action, Strut and RES – now with the assistance of Bauers – continued to submit a large amount of fraudulent no-fault insurance billing to GEICO and other insurers.

**III.     The Defendants' Fraudulent Scheme**

**A.     The Defendants' Fraudulent Treatment and Billing Protocol**

53.     Virtually all of the Insureds in the claims identified in Exhibit "1" whom the Defendants purported to treat were involved in relatively minor accidents.

54.     In keeping with the fact that virtually all of the Insureds in the claims identified in Exhibit "1" were involved in only minor accidents, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital following their accidents.

55.     To the extent that the Insureds in the claims identified in Exhibit "1" did report to a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

56.     Furthermore, to the extent that there were any police reports of the Insureds' accidents in the first instance, in most cases the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were

drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

57.     Virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

58.     Even so, the Defendants subjected the Insureds in the claims identified in Exhibit "1" to a medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the no-fault insurance billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

59.     The Defendants provided their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any continuing medical problems arising from any actual automobile accidents.

60.     Each step in the Defendants' fraudulent treatment and billing protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault insurance billing for each Insured.

61.     No legitimate physician or medical practice would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

62.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

1.      **The Fraudulent Charges for Initial Examinations**

63.     As an initial step in the Defendants' fraudulent scheme, the Defendants purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

64.     The initial examinations were performed – to the extent that they were performed at all – as a "gateway" in order to provide Insureds with predetermined, fabricated "diagnoses" to create a false basis for the Defendants to bill for medically unnecessary, illusory, or otherwise non-reimbursable follow-up examinations, extracorporeal shockwave therapy, ligament laxity testing, psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services.

65.     Bauers purported to personally perform or directly supervise virtually all of the initial examinations in the claims identified in Exhibit "1".

66.     As set forth in Exhibit "1", the Defendants then virtually always billed the purported initial examinations to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 99204, resulting in a charge of $163.85 or $196.62 for each purported initial examination; or (ii) CPT code 99244, resulting in a charge of $261.09 or $313.31 for each purported initial examination.

67.     The charges for the purported initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

68.     The charges for the purported initial examinations also were fraudulent in that they misrepresented the nature, extent, and results of the putative examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

69.      For example, in the claims for initial examinations that are identified in Exhibit "1", the Defendants routinely misrepresented the severity of the Insureds' presenting problems.

70.      Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, the use of CPT code 99244 or CPT code 99204 to bill for an initial patient examination typically requires that the patient present with problems of moderate to high severity.

71.      The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99244 and 99204 to bill for an initial patient examination.

72.      For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

(i)      Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (Colon and Rectal Surgery)

(ii)     Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)    Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

73.      Likewise, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)   Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)   Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)   Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

74.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99244 and 99204 to bill for an initial patient examination or consultation typically are problems that pose a serious threat to the patient's health, or even the patient's life.

75.   By contrast, to the limited extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their automobile accidents, the problems virtually always were low- or minimal-severity soft tissue injuries such as sprains and strains.

76.   Even so, in the claims for initial examinations identified in Exhibit "1", the Defendants routinely billed for their putative initial examinations and consultations using CPT codes 99244 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

77.   For example:

(i)   On January 23, 2023, an Insured named PL was involved in a minor automobile accident. In keeping with the fact that PL was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that PL experienced any health problems as the result of a minor accident, they were of low or minimal severity. Even so, following a purported initial examination of PL by Bauers on April 19, 2023, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that PL presented with problems of moderate to high severity.

(ii)     On July 2, 2021, an Insured named TF was involved in a minor automobile accident. TF sought treatment at Erie County Medical Center. However, and in keeping with the fact that TF was not seriously injured in the accident, he was briefly observed on an outpatient basis, and then discharged with nothing more serious than a knee contusion diagnosis. To the extent that TF experienced any health problems as the result of the minor accident, they were of low or minimal severity. Even so, following a purported initial examination of TF by Bauers on November 1, 2021, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that TF presented with problems of moderate to high severity.

(iii)    On January 25, 2023, an Insured named AD was involved in a minor automobile accident. In keeping with the fact that AD was not seriously injured in the minor accident, he did not visit the hospital or seek treatment immediately following the accident. To the extent that AD experienced any health problems as the result of a minor accident, they were of low or minimal severity. Even so, following a purported initial examination of AD by Bauers on February 7, 2023, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AD presented with problems of moderate to high severity.

(iv)     On June 15, 2022, an Insured named LJ was involved in a minor automobile accident. LJ sought treatment at Kenmore Mercy Hospital. However, and in keeping with the fact that LJ was not seriously injured in the accident, he was briefly observed on an outpatient basis, and then discharged with nothing more serious than an unspecific motor vehicle accident diagnosis. To the extent that LJ experienced any health problems as the result of the minor accident, they were of low or minimal severity. Even so, following a purported initial examination of LJ by Bauers on August 16, 2022, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that LJ presented with problems of moderate to high severity.

(v)      On November 18, 2023, an Insured named MB was involved in a minor automobile accident. In keeping with the fact that MB was not seriously injured in the minor accident, he did not visit the hospital or seek treatment immediately following the accident. To the extent that MB experienced any health problems as the result of a minor accident, they were of low or minimal severity. Even so, following a purported initial examination of MB by Bauers on January 4, 2024, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MB presented with problems of moderate to high severity.

(vi)     On September 2, 2021, an Insured named MS was involved in a minor automobile accident. MS sought treatment at Erie County Medical Center. However, and in keeping with the fact that MS was not seriously injured in the accident, he was briefly observed on an outpatient basis, and then discharged with nothing more serious than a neck pain diagnosis. To the extent that MS experienced any health problems as the result of the minor accident, they were of low or minimal severity.

16

Even so, following a purported initial examination of MS by Bauers on December 4, 2021, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that MS presented with problems of moderate to high severity.

(vii)    On June 4, 2021, an Insured named YP was involved in a minor automobile accident. In keeping with the fact that YP was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that YP experienced any health problems as the result of a minor accident, they were of low or minimal severity. Even so, following a purported initial examination of YP by Bauers on September 13, 2023, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that YP presented with problems of moderate to high severity.

(viii)    On October 29, 22, an Insured named JS was involved in a minor automobile accident. JS sought treatment at Sisters of Charity Hospital. However, and in keeping with the fact that JS was not seriously injured in the accident, she was briefly observed on an outpatient basis, and then discharged with nothing more serious than an unspecified back pain diagnosis. To the extent that JS experienced any health problems as the result of the minor accident, they were of low or minimal severity. Even so, following a purported initial examination of JS by Bauers on December 2, 2022, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that JS presented with problems of moderate to high severity.

(ix)    On January 11, 2023, an Insured named ST was involved in a minor automobile accident. In keeping with the fact that ST was not seriously injured in the minor accident, he did not visit the hospital or seek treatment immediately following the accident. To the extent that T experienced any health problems as the result of a minor accident, they were of low or minimal severity. Even so, following a purported initial examination of ST by Bauers on May 18, 2023, the Defendants billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that ST presented with problems of moderate to high severity.

(x)    On August 22, 2022, an Insured named JT was involved in a minor automobile accident. JT sought treatment at Western New York Immediate Care. However, and in keeping with the fact that JT was not seriously injured in the accident, she was briefly observed on an outpatient basis, and then discharged with nothing more serious than an unspecified neck pain diagnosis. To the extent that JT experienced any health problems as the result of the minor accident, they were of low or minimal severity. Even so, following a purported initial examination of JT by Bauers on January 11, 2023, the Defendants billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that JT presented with problems of moderate to high severity.

78. These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", the Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low- or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the examinations.

79. In the claims for initial examinations identified in Exhibits "1", the Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99244 and 99204, because examinations billable under CPT codes 99244 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

80. In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, extracorporeal shockwave therapy, ligament laxity testing, psychological testing, drug screening, prolotherapy injections, and electrodiagnostic testing.

**b.      Misrepresentations Regarding the Performance of "Comprehensive" Patient Histories**

81. What is more, in the claims for initial examinations that are identified in Exhibit "1", the Defendants routinely falsely represented that they had taken "comprehensive" patient histories during the purported examinations.

82. Pursuant to the Fee Schedule, the use of CPT codes 99244 or 99204 to bill for a patient examination represents that the examining physician took a "comprehensive" patient history during the examination.

83. Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

84. Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

85. The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i) constitutional symptoms (e.g., fever, weight loss);

(ii) eyes;

(iii) ears, nose, mouth, throat;

(iv) cardiovascular;

(v) respiratory;

(vi) gastrointestinal;

(vii) genitourinary;

(viii) musculoskeletal;

(ix) integumentary (skin and/or breast);

(x) neurological;

(xi) psychiatric;

(xii) endocrine;

(xiii) hematologic/lymphatic; and

(xiv)   allergic/immunologic.

86.     Pursuant to the CPT Assistant, a patient history also does not qualify as "comprehensive" unless the physician has taken a "complete" past, family, and social history from the patient.

87.     Pursuant to the CPT Assistant, a physician has not taken a "complete" past, family, and social history from the patient unless the physician has documented:

(i)     at least one specific item with respect to the patient's past history – e.g., the patient's past experiences with illnesses, operations, injuries, and treatments;

(ii)    at least one specific item with respect to the patient's family history – e.g., a review of medical events in the patient's family, including diseases which may be hereditary or place the patient at risk; and

(iii)   at least one specific item with respect to the patient's social history – e.g., an age-appropriate review of past and current activities.

88.     Though the Defendants routinely billed for their purported initial examinations using CPT codes 99244 and 99204, and thereby falsely represented that they had taken "comprehensive" patient histories during the purported examinations in the claims identified in Exhibit "1", neither Bauer, Strut, nor any other physician or healthcare provider at RES, took legitimate patient histories.

89.     Rather, in order to create the illusion that the Defendants took "comprehensive" patient histories from Insureds, the Defendants routinely compiled fraudulent initial examination reports and submitted them to GEICO in support of their billing for the initial examinations. The Defendants cobbled critical portions of the patient history sections of these examination reports together from pre-existing language that did not vary from patient-to-patient, and was intended to give the appearance of serious injuries where none actually existed.

90.    For example, a statistically impossible number of purported initial examination reports submitted by or on behalf of the Defendants included the following, identical patient history language:

    (i)    "Ongoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement."

    (ii)    "Ambulating distances is [sic] limited."

    (iii)    "Needs to frequently alternate standing and sitting in an attempt to improve relief."

    (iv)    "Sleep is interrupted due to pain."

    (v)    "admits to feeling anxious and/or lowered mood."

91.    In a large number of instances, this purported patient history language was controverted by police reports and hospital records, which indicated that the Insureds did not suffer, and could not legitimately have suffered, from the symptoms that the Defendants reported in the patient history sections of their initial examination reports.

92.    Moreover, there is a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

93.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

94.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

95.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or report substantially identical symptoms as the result of their accidents.

21

96.     It is even more improbable – to the point of impossibility – that this would occur over and over again.

97.     It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination and report substantially identical symptoms on or about the <u>exact same date</u> weeks, or even months, after their underlying automobile accident.

98.     Even so, in keeping with the fact that the putative "patient histories" were false, the Defendants frequently included virtually identical, boilerplate patient history language in their examination reports, oftentimes on or about the exact same date, for two or more Insureds who were involved in the same accident.

99.     For example:

(i)     On May 12, 2023, two Insureds – LP and MT – were involved in the same automobile accident. Thereafter – incredibly – LP and MT both presented at RES on the exact same date, May 19, 2023, for purported initial examinations by Bauers. LP and MT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both LP and MT would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both LP and MT had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(ii)    On March 4, 2023, two Insureds – JB and KP – were involved in the same automobile accident. Thereafter, JB and KP both presented at RES for purported initial examinations by Bauers on April 23, 2023 and August 14, 2023, respectively. JB and KP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both JB and KP would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both JB and KP had told Bauers that they were experiencing "[o]ngoing limitations while

performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(iii)     On June 10, 2023, two Insureds – DC and PC – were involved in the same automobile accident. Thereafter – incredibly – DC and PC both presented at RES on the exact same date, August 9, 2023, for purported initial examinations by Bauers. DC and PC were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both DC and PC would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both DC and PC had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(iv)     On July 8, 2020, two Insureds – MF and SF – were involved in the same automobile accident. Thereafter – more than 15 months after the accident – MF and SF both presented at RES on the exact same date, October 15, 2021, for purported initial examinations by Bauers. MF and SF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both MF and SF would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both MF and SF had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(v)     On August 10, 2021, two Insureds – MT and ZT – were involved in the same automobile accident. Thereafter, MT and ZT both presented at RES for purported initial examinations by Bauers on August 31, 2021 and August 13, 2021, respectively. MT and ZT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both MT and ZT would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that

both JB and KP had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(vi)     On September 23, 2022, two Insureds – DS and GP – were involved in the same automobile accident. Thereafter, DS and GP both presented at RES for purported initial examinations by Bauers on February 7, 2023 and October 7, 2022, respectively. DS and GP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both DS and GP would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both DS and GP had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(vii)    On March 4, 2023, two Insureds – JB and KP – were involved in the same automobile accident. Thereafter, JB and KP both presented at RES for purported initial examinations by Bauers on April 24, 2023 and August 14, 2023, respectively. JB and KP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both JB and KP would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both JB and KP had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(viii)   On October 28, 2022, two Insureds – JS and MP – were involved in the same automobile accident. Thereafter – incredibly – JS and MP both presented at RES on the exact same date, December 2, 2022, for purported initial examinations by Bauers. JS and MP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both JS and MP would report substantially identical

symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both JS and MP had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(ix)     On April 17, 2022, two Insureds – CR and TS – were involved in the same automobile accident. Thereafter, CR and TS both presented at RES for purported initial examinations by Bauers on April 18, 2022 and April 19, 2022, respectively. CR and TS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both CR and TS would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both CR and TS had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

(x)      On August 13, 2021, two Insureds – JM and MF – were involved in the same automobile accident. Thereafter – incredibly – JM and MF both presented at RES on the exact same date, September 24, 2021, for purported initial examinations by Bauers. JM and MF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. It is improbable – to the point of impossibility – that both JM and MF would report substantially identical symptomatology during the putative initial examinations. Even so, the Defendants submitted examination reports to GEICO which falsely reported that both JM and MF had told Bauers that they were experiencing "[o]ngoing limitations while performing activities of daily living and household and domestic duties due to increased pain and restricted movement", that "[a]mbulating distances [were] limited" as the result of their injuries, that both of them needed "to frequently alternate standing and sitting in an attempt to improve relief", that their "[s]leep is interrupted due to pain", and both reported "feeling anxious and/or lowered mood" as a result of their accident.

100.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", the Defendants frequently included virtually identical, boilerplate, and

false patient history language in their examination reports, oftentimes on the exact same date, for two or more Insureds who were involved in the same accident.

101.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented the Insureds' patient histories in order to create a false basis for their charges for the examinations under CPT codes 99244 and 99204, because examinations billable under CPT codes 99244 and 99204 are reimbursable at higher rates than examinations that do not involve legitimate, comprehensive patient histories.

102.    In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented the Insureds' patient histories in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, psychological testing, drug screening, prolotherapy injections, and electrodiagnostic testing.

**c.    Misrepresentations Regarding the Performance of "Comprehensive" Physical Examinations**

103.    Moreover, the claims identified in Exhibit "1" for initial examinations under CPT codes 99204 and 99244, the Defendants falsely represented the nature, extent, and results of the underlying physical examinations.

104.    Pursuant to the CPT Assistant, the use of CPT codes 99204 or 99244 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

105.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

106.   In the claims for initial examinations identified in Exhibit "1", the Defendants virtually always billed for the examinations using CPT codes 99204 or 99244, and thereby falsely represented that the physician who purported to perform the examinations – virtually always Bauers– either conducted a general examination of multiple patient organ systems or else conducted a complete examination of a single patient organ system.

107.   In fact, the purported physical examinations in the claims identified in Exhibit "1" were not genuine examinations at all. Rather, the examination "results" were simply falsified to make it appear as if the Insureds were suffering serious, continuing symptoms as the result of their automobile accidents, when in fact they were not.

108.   In keeping with the fact that the Defendants falsified the "results" of their patient examinations in order to create the illusion of serious injuries where none actually existed, in a statistically impossible number of claims for initial examinations identified in Exhibit "1", the Defendants reported identical, and false, examination "findings" for the Insureds with respect to critical examination parameters.

109.   For example, in the "PHYSICAL EXAM" section of a statistically impossible number of examination reports, the Defendants inserted the following, identical purported "examination findings" for Insureds who did not, and could not have, presented with these identical characteristics on examination:

(i)     "Examination demonstrated poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis."

(ii)    "Patient with rounded, hyperextended neck, and forward position of the head." [cervical]

(iii)   "Palpation reveals myospasms and paraspinal muscle tenderness. Percussion over the spinous processes causes pain. Occipital area was tender and sensitive on palpation. Pain elicited on palpation of the sternocleidomastoid bilaterally, anterior, middle and posterior scalenes, cervicis capitus, and upper trapezius." [cervical]

(iv)    "Palpation reveals tenderness on palpation of paraspinal muscles" [thoracic]

(v)    "There were no bony misalignments or acute fractures. Percussion over the spinous processes causes pain over the lumbar spine area. Palpation reveals myospasms with tenderness of the paraspinal, bilateral sacroiliac joints, bilateral gluteus maximus, medius and tensor facia lata. Pain elicited over the lateral border of the sacrum bilaterally." [lumbar]

110.    For example, the Defendants inserted these identical examination "findings" into the "PHYSICAL EXAM" section of their initial examination reports for – among many others – the following Insureds on the following dates:

(i)    LP, following a purported initial examination by Bauers on May 19, 2023;

(ii)    KR, following a purported initial examination by Bauers on August 10, 2023;

(iii)    JS, following a purported initial examination by Bauers on September 1, 2023;

(iv)    MS, following a purported initial examination by Bauers on December 14, 2021;

(v)    JS, following a purported initial examination by Bauers on December 2, 2022;

(vi)    JT, following a purported initial examination by Bauers on January 11, 2023;

(vii)    MF, following a purported initial examination by Bauers on September 24, 2021;

(viii)    WS, following a purported initial examination by Bauers on September 24, 2021;

(ix)    LT, following a purported initial examination by Bauers on February 10, 2022; and

(x)    SD, following a purported initial examination by Bauers on July 13, 2021.

111.    These are only representative examples. In the substantial majority of the claims for initial examinations identified in Exhibit "1", the Defendants inserted these identical examination "findings" into the "PHYSICAL EXAM" section of their initial examination.

112.    As set forth above, there is a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

113.    It is improbable – to the point of impossibility – that two or more Insureds who were involved in the same accident would "just happen" to present at RES on or about the same date after their accidents, with substantially identical symptomatology.

114.    Even so, in the claims for initial examinations that are identified in Exhibit "1", the Defendants often falsely reported – in their examination reports – that two or more Insureds who had been involved in the same underlying accident displayed these identical symptoms on examination.

115.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely reported that two or more Insureds who had been involved in the same underlying, and usually minor, accident had substantially identical symptomatology on examination by Bauers.

116.    It is impossible that the substantial majority of the Insureds in the claims identified in Exhibit "1" actually presented at RES with this identical symptomatology. Rather, the Defendants falsely represented that the substantial majority of the Insureds in the claims identified in Exhibit "1" presented with this identical symptomatology in order to create the false appearance that Bauers legitimately examined the Insureds, when in fact he did not.

117.    In the claims for initial examinations identified in Exhibits "1", the Defendants routinely falsely represented the Insureds' examination results in order to create a false basis for their charges for the examinations under CPT codes 99244 and 99204, because examinations billable under CPT codes 99244 and 99204 are reimbursable at higher rates than examinations that do not involve legitimate, comprehensive patient examinations.

118.    In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented the Insureds' examination results in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the

Insureds, including follow-up examinations, psychological testing, drug screening, prolotherapy injections, and electrodiagnostic testing.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

119.    Pursuant to the Fee Schedule, the use of CPT codes 99244 or 99204 to bill for an initial patient examination represents that the examination involved moderately complex medical decision-making.

120.    In every claim identified in Exhibit "1" for initial examinations under CPT codes 99204 and 99244, the Defendants falsely represented that the examining physician – virtually always Bauers – engaged in "moderate complexity" medical decision-making during the purported examinations.

121.    Pursuant to the Fee Schedule and the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options

122.    In this context, and as noted above, the CPT Assistant provides various clinical examples of the types of presenting problems that legitimately could require moderately complex medical decision-making, and thereby justify the use of CPT codes 99244 and 99204 to bill for an initial patient examination.

123.    For example, the CPT Assistant provides the following clinical examples of presenting problems that legitimately could require moderately complex medical decision-making, and would support the use of CPT code 99244 to bill for an initial patient consultation:

(i)     Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (Colon and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)   Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

124.    Likewise, the CPT Assistant provides the following clinical examples of presenting problems that legitimately could require moderately complex medical decision-making, and would support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

125.    Accordingly, pursuant to the CPT Assistant, the moderately complex medical decision-making that could support the use of CPT codes 99244 and 99204 to bill for an initial patient examination or consultation typically involves problems that pose a serious threat to the patient's health, or even the patient's life.

126.   However, in the claims for initial examinations that are identified in Exhibit "1", the Insureds virtually always presented with nothing more serious than minor soft tissue injury complaints, to the extent that they had any presenting problems at all.

127.   The diagnosis and treatment of these minor soft tissue injury complaints did not legitimately require any moderately complex medical decision-making.

128.   In fact, though the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity", in actuality the initial examinations did not involve any medical decision-making at all.

129.   First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information. When the Insureds presented to RES for the putative initial examinations, they did not arrive with any medical records except, occasionally, basic radiology or electrodiagnostic testing reports. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

130.   Second, in the claims for initial examinations identified in Exhibit "1",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

131.   Third, in virtually every case, neither Bauers, Strut, nor any other physician or healthcare provider associated with RES considered any significant number of diagnoses or treatment options for the Insureds during the purported initial examinations.

132.   Even so, at the conclusion of each of the putative initial examinations in the claims identified in Exhibit "1", the Defendants prepared initial examination reports in which they

provided false extremity, neck, and/or back soft tissue injury "diagnoses" to virtually every Insured.

133.    Then, based upon these false "diagnoses", the Defendants recommended that virtually every Insured continue to receive additional Fraudulent Services from RES, including medically unnecessary follow-up examinations, psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services.

134.    In keeping with the fact that the Defendants' purported initial examinations did not involve any medical decision-making at all, the putative "results" of the initial examinations were fabricated, as shown by the fact that – as set forth above – the Defendants falsely reported that the substantial majority of Insureds supposedly displayed identical symptomatology on examination, a medical impossibility.

135.    What is more – and again, in keeping with the fact that the Defendants' purported initial examinations did not involve any medical decision-making at all – the predetermined boilerplate "results" of the initial examinations frequently were controverted by police reports and/or hospital records, which indicated that the Insureds did not and could not have suffered from the false symptomatology reported by the Defendants.

136.    In the claims for initial examinations identified in Exhibit "1", the Defendants routinely falsely represented that the initial examinations involved "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99244 and 99204 because examinations billable under CPT codes 99244 and 99204 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

137.     In the claims for initial examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the putative initial examinations and consultations involved "moderate complexity" medical decision-making in order to create a false basis for the additional Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, extracorporeal shockwave therapy, ligament laxity testing, psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services.

**2.      The Fraudulent Charges for "Opioid Risk Tool" Questionnaires**

138.     To maximize their fraudulent charges in the claims that are identified in Exhibit "1", the Defendants virtually always submitted a separate charge of $48.28 under CPT code 96103 for purported "Opioid Risk Tool" questionnaires that they supposedly provided to the Insureds on the same dates as the putative initial examinations.

139.     Pursuant to the CPT Assistant, CPT code 96103 is used to bill for computer-administered psychological testing, which must include interpretation of the test results and a report by a qualified healthcare professional. As set forth in the CPT Assistant, the preparation of a report by a qualified healthcare professional interpreting computer-administered psychological testing "is very detailed and time-consuming work".

140.     The CPT Assistant makes clear that computerized questionnaires regarding the risk of potential opioid misuse or abuse may not be billed under CPT code 96103, because CPT code 96103 is reserved for computer-administered testing as part of a comprehensive psychological assessment.

141.     In this context, the "Opioid Risk Tools" that the Defendants billed to GEICO under CPT code 96103 were simple checklist questionnaires in which the Insureds checked "yes" or "no"

in response to 10 questions regarding whether the Insureds had any family history of substance abuse, and personal history of substance abuse, sexual abuse, and depression.

142.    The "Opioid Risk Tool" checklists typically took less than one minute for the Insureds to complete, and neither Bauers, Strut, nor any other healthcare professional associated with RES ever interpreted the test "results" at all.

143.    In the claims identified in Exhibit "1", each and every one of the Defendants' charges for the "Opioid Risk Tool" questionnaires under CPT code 96103 falsely represented that the underlying service constituted a legitimate psychological test, that a qualified healthcare professional legitimately interpreted the test results, and that the questionnaires were billable under CPT code 96103 in the first instance.

144.    What is more, since a patient history must be obtained as an element of a soft-tissue trauma patient's initial examination, and since the "Opioid Risk Tool" checklists were nothing more than questionnaires regarding the Insureds' past, family, and social histories, the Fee Schedule provides that such questionnaires are to be reimbursed as an element of the charges for the initial examinations.

145.    In other words, healthcare providers cannot conduct and bill for an initial examination, then bill separately for the type of contemporaneously-provided "Opioid Risk Tool" questionnaires that the Defendants purported to provide.

146.    The information gained through the use of the "Opioid Risk Tool" questionnaires that the Defendants purported to provide was not significantly different from the information that the Defendants purported to obtain as an element of virtually every Insured's initial examination.

147.   Under the circumstances employed by the Defendants, the "Opioid Risk Tool" questionnaires represented purposeful and unnecessary duplication of the patient histories purportedly obtained during the virtually every Insured's initial examination.

148.   The "Opioid Risk Tool" questionnaires were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a predetermined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**3.   The Fraudulent Charges for Follow-Up Examinations**

149.   In addition to their fraudulent initial examinations, the Defendants typically purported to subject the Insureds in the claims identified in Exhibit "1" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

150.   Bauers purported to personally perform or directly supervise virtually all of the putative follow-up examinations in the claims identified in Exhibit "1".

151.   As set forth in Exhibit "1", the Defendants then virtually always billed the purported follow-up examinations to GEICO, or caused them to be billed to GEICO, under: (i) CPT code 99214, resulting in a charge of $122.94 or $102.45 for each purported follow-up examination; or (ii) CPT code 99213, resulting in a charge of $84.72 or $70.60 for each purported initial examination.

152.   The charges for the purported follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

153.    The charges for the purported follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the putative examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

154.    For instance, in the claims for follow-up examinations that are identified in Exhibit "1", the Defendants routinely misrepresented the severity of the Insureds' presenting problems.

155.    Pursuant to the Fee Schedule and CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

156.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of moderate to high severity, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination, specifically:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

157.    Accordingly, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

158.    Pursuant to the Fee Schedule and CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

159.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination, specifically:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

160.     Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

161.     By contrast, to the limited extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their automobile accidents, the problems virtually always were, at the outset, low or minimal severity soft tissue injuries such as sprains and strains.

162.     Soft tissue injuries such as sprains and strains virtually always resolve after a short course of conservative treatment, or no treatment at all.

163.     By the time the Insureds in the claims identified in Exhibit "1" presented to RES for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their automobile accidents, or their presenting problems were minimal.

164.     Even so, in the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely billed for their putative follow-up examinations under CPT codes 99214 and 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity or low to moderate severity, despite the fact that the purported examinations typically were provided months after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the automobile accidents would have resolved.

165.     For example:

(i)      On January 23, 2023, an Insured named PL was involved in a minor automobile accident. In keeping with the fact that PL was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that PL experienced any health problems as the result of the

minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of PL by Bauers on April 27, 2023, May 26, 2023, June 23, 2023, July 5, 2023, July 18, 2023, August 15, 2023, and November 14, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that PL presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of PL by Bauers on May 5, 2023, May 11, 2023, June 9, 2023, August 23, 2023, October 10, 2023, and January 4, 2024, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that PL presented with problems of low to moderate severity during each purported examination.

(ii)  On September 24, 2020, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that AM was not seriously injured in the minor accident, he did not visit the hospital or seek treatment immediately following the accident. To the extent that AM experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of AM by Bauers and Strut on January 23, 2023, April 5, 2023, April 10, 2023, August 1, 2023, July 22, 2022, and August 1, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that AM presented with problems of moderate to high severity during each purported examination.

(iii)  On June 15, 2022, an Insured named LJ was involved in a minor automobile accident. LJ sought treatment at Kenmore Mercy Hospital. However, and in keeping with the fact that LJ was not seriously injured in the accident, he was briefly observed on an outpatient basis, and then discharged with nothing more serious than an unspecific motor vehicle accident diagnosis. To the extent that LJ experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of LJ by Bauers on December 8, 2022, January 16, 2023, March 15, 2023, March 22, 2023, March 29, 2023, and May 16, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99214, and thereby falsely represented that LJ presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of LJ by Bauers on September 20, 2022, October 11, 2022, November 4, 2022, February 13, 2023, April 11, 2023, April 18, 2023, June 13, 2023, July 17, 2023, August 14, 2023, September 12, 2023, and October 10, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that LJ presented with problems of low to moderate severity during each purported examination.

(iv)     On March 19, 2019, an Insured named AM was involved in a minor automobile accident. In keeping with the fact that AM was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that AM experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of AM by Bauers and Strut on July 22, 2022, August 12, 2022, August 31, 2022, October 12, 2022, November 9, 2022, November 21, 2022, January 5, 2023, February 13, 2023, March 7, 2023, May 5, 2023, May 18, 2023, June 23, 2023, July 10, 2023, July 28, 2023, August 18, 2023, August 31, 2023, October 5, 2023, and November 17, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that AM presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of AM by Bauers on August 25, 2022, April 7, 2023, June 2, 2023, September 12, 2023, October 23, 2023, and December 19, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that AM presented with problems of low to moderate severity during each purported examination.

(v)      On August 22, 2022, an Insured named JT was involved in a minor automobile accident. JT sought treatment at Western New York Immediate Care. However, and in keeping with the fact that JT was not seriously injured in the accident, she was briefly observed on an outpatient basis, and then discharged with nothing more serious than an unspecified neck pain diagnosis. To the extent that JT experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of JT by Bauers on January 31, 2023, April 19, 2023, May 23, 2023, and June 28, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99214, and thereby falsely represented that JT presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of JT by Bauers on March 1, 2023, August 30, 2023, and October 3, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that JT presented with problems of low to moderate severity during each purported examination.

(vi)     On August 13, 2021, an Insured named MF was involved in a minor automobile accident. MF sought treatment at Western New York Immediate Care. However, and in keeping with the fact that MF was not seriously injured in the accident, she was briefly observed on an outpatient basis, and then discharged with nothing more serious than a cervical sprain diagnosis. To the extent that MF experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of MF by Bauers on October 8, 2021, November 9, 2021, December 7, 2021, January 11, 2022, March 15, 2022,

April 15, 2022, May 9, 2022, June 7, 2022, July 8, 2022, August 5, 2022, September 2, 2022, October 7, 2022, December 5, 2022, January 10, 2023, February 17, 2023, March 24, 2023, May 19, 2023, and August 25, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99214, and thereby falsely represented that MF presented with problems of moderate to high severity during each purported examination.

(vii)   On January 31, 2018, an Insured named LN was involved in a minor automobile accident. In keeping with the fact that LN was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that LN experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of LN by Bauers on February 6, 2023 and October 16, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that PL presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of LN by Bauers on June 13, 2022, August 17, 2022, August 29, 2022, October 10, 2022, December 5, 2022, December 5, 2022, January 11, 2023, January 31, 2023, February 13, 2023, February 16, 2023, February 20, 2023, March 9, 2023, April 6, 2023, May 16, 2023, and October 17, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that LN presented with problems of low to moderate severity during each purported examination.

(viii)   On January 31, 2022, an Insured named SD was involved in a minor automobile accident. SD sought treatment at Erie County Medical Center. However, and in keeping with the fact that SD was not seriously injured in the accident, she was briefly observed on an outpatient basis, and then discharged with nothing more serious than a shoulder pain diagnosis. To the extent that SD experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of SD by Bauers on October 1, 2021, October 22, 2021, April 18, 2022, June 10, 2022, and March 16, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99214, and thereby falsely represented that SD presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of SD by Bauers on August 2, 2021, August 30, 2021, September 20, 2021, November 19, 2021, December 17, 2021, January 19, 2022, February 18, 2022, March 21, 2022, May 10, 2022, July 11, 2022, August 11, 2022, September 8, 2022, October 10, 2022, November 10, 2022, December 12, 2022, January 12, 2023, February 13, 2023, April 18, 2023, May 18, 2023, June 15, 2023, July 17 2023, August 14, 2023, and September 12, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that SD presented with problems of low to moderate severity during each purported examination.

(ix)    On January 25, 2023, an Insured named AD was involved in a minor automobile accident. In keeping with the fact that AD was not seriously injured in the minor accident, he did not visit the hospital or seek treatment immediately following the accident. To the extent that AD experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, following purported follow-up examinations of AD by Bauers on March 1, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that AD presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of AD by Bauers on April 5, 2023 and May 17, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that AD presented with problems of low to moderate severity during each purported examination.

(x)    On November 4, 2016, an Insured named DO was involved in a minor automobile accident. In keeping with the fact that DO was not seriously injured in the minor accident, she did not visit the hospital or seek treatment immediately following the accident. To the extent that DO experienced any health problems as the result of the minor accident, they were of low severity at the outset, and had completely resolved within three months of the minor accident. Even so, years after the accident, following purported follow-up examinations of DO by Bauers and Strut on January 5, 2022, February 8, 2023, May 15, 2023, and June 13, 2023, the Defendants billed GEICO for a follow-up examination using CPT code 99214, and thereby falsely represented that DO presented with problems of moderate to high severity during each purported examination. What is more, following purported follow-up examinations of DO by Bauers on December 8, 2021, March 30, 2022, June 14, 2022, August 2, 2022, November 4, 2022, December 13, 2022, July 18, 2023, and September 5, 2023, the Defendants billed GEICO for follow-up examinations using CPT code 99213, and thereby falsely represented that DO presented with problems of low to moderate severity during each purported examination.

166.    These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibit "1", the Defendants falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations – which often were many months after the minor accidents – or else their presenting problems were minimal.

167.    In the claims for follow-up examinations identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

168.    In the claims for follow-up examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional medically unnecessary follow-up examinations, as well as psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

169.    Furthermore, pursuant to the Fee Schedule, when the Defendants submitted charges for the purported follow-up examinations under CPT code 99214, they represented that the physicians who purported to perform the examinations – i.e., Bauers and Strut – performed at least two of the following three components: (I) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

170.    Pursuant to the Fee Schedule, when the Defendants submitted charges for the purported follow-up examinations under CPT code 99213, they represented that Bauers and Strut performed at least two of the following three components: (i) took an "expanded problem focused"

patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

171.   In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", the Defendants did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

172.   Rather, following their purported follow-up examinations, the Defendants simply reiterated the false, boilerplate "diagnoses" that they provided to the Insureds following their purported initial examinations, and recommended that the Insureds continue to return to RES for additional medically unnecessary Fraudulent Services.

173.   In fact, in most cases, the Defendants continued to falsely report – after each purported follow-up examination – that the Insureds supposedly continued to have the same symptoms that they had following their purported initial examinations.

174.   The Defendants frequently reported that the Insureds displayed identical symptomatology after each purported follow-up examination despite the fact that the Insureds' minor accidents did not cause, and could not have caused, the Insureds to display such long-term, identical symptomatology.

175.   For example:

(i)   On May 12, 2023, an Insured named MT was involved in a minor automobile accident. To the extent that MT suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, MT to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on May 19, 2023, but also purported follow-up examinations by Bauers and Strut on May 24, 2023, June 8, 2023, July 26, 2023, and August 11, 2023, the Defendants falsely reported that MT continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]ain and stiffness was noted through testing"; (d) "[p]atient had

no midline tenderness"; (e) "[h]e was tender to palpation overlying bilateral cervical paraspinals, trapezius, and rhomboid musculature appearing to have moderate myofascial pain"; (f) "[p]alpation reveals tenderness on palpation [sic] of paraspinal muscles";  and (g) "[h]e had midline tenderness approximately T2-T6 levels".

(ii)   On January 25, 2023, an Insured named AD was involved in a minor automobile accident. To the extent that AD suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, AD to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on February 7, 2023, but also purported follow-up examinations by Bauers on March 1, 2023, April 5, 2023, and May 17, 2023, the Defendants falsely reported that AD continued to display identical symptomatology at each examination, including: (a) "rounded, hyperextended neck, and forward position of the head "; (b) "tenderness in the right paraspinal region and in the right scalene""; (c) "mild tenderness in the right sternocleidomastoid"; (d) ""some tenderness at the insertion of right levator scapula"; (e) "slight weakness of right shoulder abduction with pain on resisted abduction of right shoulder"' (f) "slight weakness of the right biceps"; and (g) "slight weakness of right wrist flexion and extension".

(iii)   On April 27, 2023, an Insured named MH was involved in a minor automobile accident. To the extent that MH suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, MH to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on May 5, 2023, but also purported follow-up examinations by Bauers on May 11, 2023, May 18, 2023, May 24, 2023, June 8, 2023, June 14, 2023, July 6, 2023, August 3, 2023, August 2023, September 13, 2023, and October 6, 2023, the Defendants falsely reported that MH continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]alpation reveals myospasms and paraspinal muscle tenderness"; (d) "[p]ercussion over the spinous processes causes pain"; (e) "[o]ccipital area was tender and sensitive on palpation, right worse than left"; (f) "[p]ain eleicited on palpation of the sternocleidomastoid bilaterally, anterior, middle and posterior scalenes, cervicis capitus, and upper trapezius"; (g) "tenderness on palpation of paraspinal muscles"; and (h) "increased muscle tone and myofascial tenderness noted throughout".

(iv)   On March 4, 2023, an Insured named NR was involved in a minor automobile accident. To the extent that NR suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, NR to display identical – and quite serious – symptomatology during numerous physical examinations occurring

over the course of several months. Even so, following not only a purported initial examination by Bauers on April 24, 2023, but also purported follow-up examinations by Bauers and Strut on May 17, 2023, May 31, 2023, June 28, 2023, July 28, 2023, August 11, 2023, and August 15, 2023, the Defendants falsely reported that NR continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]ain and stiffness was noted through testing"; (d) "tender to palpation midlines lower cervical spine C6-T1"; (e ) "tender to palpation overlying bilateral cervical paraspinals, trapezius, and rhomboid musculature"; (f) "moderate myofascial pain"; and (g) "tenderness on palpation of paraspinal muscles".

(v)     On April 12, 2023, an Insured named YS was involved in a minor automobile accident. To the extent that YS suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, YS to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on April 20, 2023, but also purported follow-up examinations by Bauers and Strut on May 4, 2023, May 18, 2023, May 31, 2023, June 2, 2023, June 8, 2023, June 15, 2023, June 29, 2023, July 12, 2023, August 9, 2023, August 23, 2023, September 6, 2023, and October 4, 2023, the Defendants falsely reported that YS continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]alpation over the spinous processes causes pain over the lumbar spine area; (d) "[p]alpation reveals myospasms with tenderness of the paraspinal, bilateral sacroiliac joints, bilateral gluteus maximus, medius and tensor fascia lata"; and (e ) "[p]ain elicted over the lateral border of the sacrum bilaterally."

(vi)    On December 8, 2021, an Insured named LR was involved in a minor automobile accident. To the extent that LR suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, LR to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on July 13, 2022, but also purported follow-up examinations by Bauers on July 27, 2022, August 5, 2022, August 16, 2022, September 14, 2022, September 23, 2022, October 11, 2022, October 19, 2022, December 6, 2022, December 13, 2022, December 16, 2022, December 202, 2022, January 11, 2023, January 17, 2023, January 24, 2023, January 13, 2023, February 7, 2023, March 9, 2023, April 10, 2023, May 10, 2023, June 12, 2023, June 17, 2023, August 17, 2023, September 18, 2023, October 19, 2023, October 26, 2023, November 7, 2023, November 28, 2023, and December 2023, the Defendants falsely reported that LR continued to display identical symptomatology at each examination, including: (a) "rounded, hyperextended neck, and forward position of

the head "; (b) "cervical tenderness at C2 and C# and also around C% and C6 levels"; (c) "tenderness in the right paraspinal area"; (d) "tenderness in the right scalenes with multiple active tender points"; (e) "[r]ight trapezius has significant spasm with multiple active trigger points"; (f) "tenderness over the left quadratus lumborum insertion"; and (g) "tenderness over the left tensor fascia lata".

(vii)   On November 7, 2021, an Insured named BB was involved in a minor automobile accident. To the extent that BB suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, BB to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on November 16, 2021, but also purported follow-up examinations by Bauers and Strut on December 1, 2021, December 30, 2021, January 31, 2022, March 1, 2022, March 31, 2022, April 29, 2022, May 27, 2022, July 8, 2022, August 10, 2022, September 8, 2022, October 7, 2022, November 8, 2022, December 8, 2022, January 6, 2023, February 10, 2023, March 10, 2023, April 12, 2023, May 15, 2023, June 15, 2023, July 17, 2023, August 17, 2023, September 20, 2023, October 19, 2023, November 20, 2023, and December 19, 2023, the Defendants falsely reported that BB continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and exaggeration of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]alpation reveals myospasms and bilateral paraspinal muscles tenderness with spasms on the left"; (d) "[p]ercussion over the spinous processes causes pain"; (e) "[b]ilateral occipital area was tender and sensitive on palpation"; (f) "[p]ain elicited on palpation of the right sternocleidomastoid, bilateral scalenes, cervicis capitus, and bilateral trapezius"; (g) "[p]alpation reveals tenderness on palpation [sic] of paraspinal muscles and mid thoracic spine"; and (h) "[p]ercussion over the spinous processes causes pain over the lumbar spine area and tenderness at L2-L3 level."

(viii)   On August 2, 2021, an Insured named AC was involved in a minor automobile accident. To the extent that AC suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, AC to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on September 17, 2021, but also purported follow-up examinations by Bauers on October 1, 2021, November 18, 2021, December 20, 2021, January 20, 2022, February 21, 2022, March 21, 2022, March 28, 2022, April 25, 2022, May 16, 2022, June 20, 2022, July 13, 2022, August 3, 2022, and August 31, 2022, the Defendants falsely reported that AC continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and some loss of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]alpation reveals myospasms and bilateral paraspinal muscles tenderness";

(d) "[p]ercussion over the spinous processes causes pain"; (e) "[r]ight occipital area was tender and sensitive on palpation"; (f) "[p]ain elicited on palpation of the sternocleidomastoid bilaterally, bilateral scalenes, cervicis capitus, and upper trapezius"; (g) "[p]alpation reveals tenderness on palpation [sic] of paraspinal muscles and T12-L1 and L2 area"; (h) "[p]ercussion over the spinous processes causes pain over the lumbar spine area; (i) "[p]alpation reveals myospams with tenderness of the paraspinal, right sacroiliac joints, right gluteus maximus, mdeius and right tensor fascia lata"; and (j) "[p]ain elicited over the right border of the sacrum bilaterally".

(ix)     On February 8, 2022, an Insured named DD was involved in a minor automobile accident. To the extent that DD suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, DD to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Strut on February 16, 2022, but also purported follow-up examinations by Bauers and Strut on February 25, 2022, February 28, 2022, March 29, 2022, April 29, 2022, May 31, 2022, June 30, 2022, August 2, 2022, August 30, 2022, September 30, 2022, November 1, 2022 and December 1, 2022, the Defendants falsely reported that DD continued to display identical symptomatology at each examination, including: (a) "poor body mechanics with hyperkyphotic posture, rounded shoulders and straightening of the lumbosacral lordosis"; (b) "rounded, hyperextended neck, and forward position of the head "; (c) "[p]alpation reveals myospasms and bilateral paraspinal muscles tenderness"; (d) "[p]ercussion over the spinous processes causes pain"; (e) "[o]ccipital area was tender and sensitive on palpation"; (f) "[p]ain elicited on palpation of the sternocleidomastoid bilaterally, anterior, middle and posterior scalenes, cervicis capitus, and upper trapezius"; (g) "[p]alpation reveals tenderness on palpation [sic] of paraspinal muscles"; (h) "[p]ercussion over the spinous processes causes pain over the lumbar spine area; and (i) "[p]ain elicited over the lateral border of the sacrum bilaterally".

(x)     On June 16, 2021, an Insured named AC was involved in a minor automobile accident. To the extent that AC suffered any injuries at all in the minor accident, the injuries did not cause, and could not have caused, AC to display identical – and quite serious – symptomatology during numerous physical examinations occurring over the course of several months. Even so, following not only a purported initial examination by Bauers on December 13, 2021, but also purported follow-up examinations by Bauers on December 20, 2021, January 13, 2022, January 31, 2022, February 23, 2022, March 30, 2022, June 3, 2022, July 13, 2022, September 23, 2022, February 6, 2023, February 22, 2023, March 8, 2023 and March 15, 2023, the Defendants falsely reported that AC continued to display identical symptomatology at each examination, including: (a) "rounded, hyperextended neck, and forward position of the head "; (b) "[p]alpation reveals myospasms and bilateral paraspinal muscles tenderness"; (c) "[p]ercussion over the spinous processes causes pain"; (d) "[o]ccipital area was tender and sensitive on palpation"; (e) "[p]ain elicited on palpation of the anterior, middle and posterior scalenes,

cervicis capitus, and upper trapezius"; and (f) "[p]alpation reveals tenderness on palpation [sic] of paraspinal muscles".

176.    These are only representative examples. In the substantial majority of claims for purported follow-up examinations that are identified in Exhibit "1", the Defendants continued to falsely report – after each purported follow-up examination – that the Insureds supposedly continued to have the same symptoms that they had following their purported initial examinations. This, despite the fact that the Insureds' minor accidents did not cause, and could not have caused, the Insureds to display such long-term, identical symptomatology.

177.    In fact, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the presenting problems virtually always were minor soft tissue injuries at the outset, and either had completely resolved by the time of the purported follow-up examinations, or else had resolved to the point where they were minimal.

178.    In the claims for follow-up examinations that are identified in Exhibit "1", the Defendants routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

179.    In the claims for follow-up examinations identified in Exhibit "1", the Defendants also routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for the laundry list of other medically unnecessary Fraudulent Services that the Defendants purported to provide to the Insureds,

including additional follow-up examinations, psychological testing, drug screening, electrodiagnostic testing, prolotherapy injections, and related services.

## 4. The Fraudulent Charges for Ligament Laxity Testing

180. As part of the Defendants' fraudulent scheme, the Defendants directed the majority of Insureds to receive putative "ligament laxity testing" services at RES.

181. Strut purported to perform virtually all of the ligament laxity testing services at RES.

182. As set forth in Exhibit "1", RES and Strut then billed the purported ligament laxity testing to GEICO under CPT code 76499, resulting in a charge of $468.11 for each purported round of tests.

183. As set forth below, the charges for the putative ligament laxity testing were fraudulent because the ligament laxity testing services were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

184. In keeping with the lack of medical necessity for the ligament laxity testing, the Defendants virtually always failed to do any specific testing for hypermobility during the physical exams they purported to perform. In fact, to the extent that the Defendants purported to test Insureds' ranges of motion, they virtually always reported normal or decreased mobility, i.e., not hypermobility.

185. In a legitimate clinical setting, the laxity – or instability – of spinal ligaments may be assessed and diagnosed through a routine MRI.

51

186. By contrast, supposed ligament laxity testing purports to use a digital x-ray device to quantify the extent of ligament laxity in particular spinal levels.

187. There is a dearth of quality supportive scientific evidence for the use of ligament laxity testing to diagnose soft tissue injuries in patients involved in automobile accidents.

188. What is more, even assuming that there was some diagnostic value for the ligament laxity testing (and there was not), the ligament laxity testing was duplicative of the MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the ligament laxity testing that RES and Strut purported to provide.

189. Additionally, and in keeping with the fact that ligament laxity testing was provided as part of Defendants' predetermined fraudulent treatment protocol designed to maximize profit – as opposed to genuinely benefit patients – the Defendants routinely billed for multiple rounds ligament laxity testing on a single Insured

190. Moreover, and in keeping with the fact that the ligament laxity testing purportedly provided at RES was medically unnecessary, whatever supposed quantitative findings the ligament laxity testing generated were never legitimately incorporated into any of the Insureds' courses of treatment at RES.

191. Instead, following the putative ligament laxity testing, RES and Strut routinely directed the Insureds identified in Exhibit "1" to continue to receive a virtually identical course of treatment as had been recommended for that Insured prior to the supposed ligament laxity testing.

192. For example:

(i) On January 23, 2023, an Insured named PL was involved in an automobile accident. Thereafter, on April 19, 2023, PL presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided PL with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that PL begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every

other Insured. Then, on May 2, 2023, May 5, 2023, and July 24, 2023, RES and Strut purported to provide PL with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into PL's supposed "treatment" plan, and PL thereafter received substantially the same treatment as had been recommended to PL prior to the ligament laxity testing being provided.

(ii)    On May 30, 2023, an Insured named LK was involved in an automobile accident. Thereafter, on June 14, 2023, LK presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided LK with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that LK begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on June 23, 2023, July 10, 2023, and August 8, 2023, RES and Strut purported to provide LK with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into LK's supposed "treatment" plan, and LK thereafter received substantially the same treatment as had been recommended to LK prior to the ligament laxity testing being provided.

(iii)   On April 5, 2023, an Insured named VC was involved in an automobile accident. Thereafter, on April 24, 2023, VC presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided VC with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that VC begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on April 26, 2023 and May 5, 2023, RES and Strut purported to provide VC with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into VC's supposed "treatment" plan, and VC thereafter received substantially the same treatment as had been recommended to VC prior to the ligament laxity testing being provided.

(iv)    On January 3, 2023, an Insured named RA was involved in an automobile accident. Thereafter, on January 25, 2023, RA presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided RA with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that RA begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on February 22, 2023 and March 9, 2023, RES and Strut purported to provide RA with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into RA's supposed "treatment" plan, and RA thereafter received substantially the same

treatment as had been recommended to RA prior to the ligament laxity testing being provided.

(v)     May 31, 2023, an Insured named JK was involved in an automobile accident. Thereafter, on August 15, 2023, JK presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided JK with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that JK begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on August 18, 2023 and August 29, 2023, RES and Strut purported to provide JK with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into JK's supposed "treatment" plan, and JK thereafter received substantially the same treatment as had been recommended to JK prior to the ligament laxity testing being provided.

(vi)    October 4, 2021, an Insured named NT was involved in an automobile accident. Thereafter, on October 13, 2021, NT presented to RES for an initial examination by Strut. At the conclusion of the putative examination, RES and Strut provided NT with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that NT begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on the same day as the initial examination, October 13, 2021, RES and Strut purported to provide NT with ligament laxity tests at RES, followed by additional ligament laxity tests on November 10, 2021, September 27, 2022, and October 26, 2022. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into NT's supposed "treatment" plan, and NT thereafter received substantially the same treatment as had been recommended to NT prior to the ligament laxity testing being provided.

(vii)    On June 31, 2023, an Insured named SR was involved in an automobile accident. Thereafter, on August 3, 2023, SR presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided SR with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that SR begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on the same day as the initial examination, August 3, 2023, RES and Strut purported to provide SR with ligament laxity tests at RES, followed by an additional ligament laxity test on August 17, 2023. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into SR's supposed "treatment" plan, and SR thereafter received substantially the same treatment as had been recommended to SR prior to the ligament laxity testing being provided.

(viii)   On September 12, 2022, an Insured named CF was involved in an automobile accident. Thereafter, on September 29, 2023, CF presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided CF with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that CF begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on the same day as the initial examination, September 29, 2023, RES and Strut purported to provide CF with ligament laxity tests at RES, followed by an additional ligament laxity test on October 13, 2023. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into CF's supposed "treatment" plan, and CF thereafter received substantially the same treatment as had been recommended to CF prior to the ligament laxity testing being provided.

(ix)   On August 8, 2022, an Insured named KB was involved in an automobile accident. Thereafter, on August 30, 2023, KB presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided KB with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that KB begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on the same day as the initial examination, August 30, 2022, RES and Strut purported to provide KB with ligament laxity tests at RES, followed by an additional ligament laxity test on September 22, 2022. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into KB's supposed "treatment" plan, and KB thereafter received substantially the same treatment as had been recommended to KB prior to the ligament laxity testing being provided.

(x)   On July 11, 2023, an Insured named RD was involved in an automobile accident. Thereafter, on August 4, 2023, RD presented to RES for an initial examination by Bauers. At the conclusion of the putative examination, RES and Bauers provided RD with substantially the same soft tissue injury "diagnoses" they provided to virtually every Insured and recommended that RD begin substantially the same course of medically unnecessary "treatment" they recommended to virtually every other Insured. Then, on August 11, 2023 and August 24, 2023, RES and Strut purported to provide RD with ligament laxity tests at RES. However – and in keeping with the fact that the ligament laxity tests were medically unnecessary – the "results" of the ligament laxity testing were never incorporated into RD's supposed "treatment" plan, and RD thereafter received substantially the same treatment as had been recommended to RD prior to the ligament laxity testing being provided.

193.    These are only representative examples. In the claims identified in Exhibit "1", RES and Strut routinely misrepresented the medical necessity of the putative ligament laxity testing.

194.    In fact, the ligament laxity testing was never medically necessary, as RES and Strut never incorporated the results of the putative "tests" into the diagnosis or treatment of the Insureds who presented to RES.

**5.    The Fraudulent Charges for Extracorporeal Shockwave Testing**

195.    The Defendants also purported to subject numerous Insureds they "treated" to medically unnecessary extracorporeal shockwave therapy ("ESWT").

196.    The Defendants then billed for ESWT using CPT code 0101T, which is listed in the Fee Schedule as a "temporary code" identifying emerging technology. Temporary codes may become permanent codes or deleted during updates of the code set.

197.    The Defendants' billing for ESWT using CPT code 0101T generally resulted in charges of $563.03 for each single ESWT treatment that they purported to provide.

198.    The Defendants typically charged GEICO for three to eighteen sessions of ESWT per Insured, resulting in charges ranging from $1,126.06 to $12,949.69 per Insured.

199.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy".

200.    ESWT is a nonsurgical treatment that involves the delivery of high energy shock waves to musculoskeletal areas of the body with the purported goal of reducing pain and promoting the healing of affected soft tissue.

201.    During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves that

purportedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process are released into the treatment area.

202.    Defendants purportedly provided their ESWT treatments to Insureds who were experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

203.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

204.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

205.    By contrast, the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational.

206.    In keeping with the fact that ESWT for the treatment of back, neck, and shoulder pain is not a legitimate treatment option, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain.

207.    In addition, the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

208.    What is more, there are no legitimate peer reviewed data that establishes the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

209.    In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

210.    The Defendants' billing for ESWT treatments through RES was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to such treatments.

211.    In many cases, Strut, Bauers, and RES purported to provide ESWT treatments to Insureds soon after their accident and without giving the patients the opportunity to sufficiently respond to conservative physical therapy.

212.    Contrary to the Defendants' false representations, the charges for the ESWT treatments were medically unnecessary, part of the Defendants' fraudulent treatment and billing protocol, and designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

213.     Furthermore, the Defendants' charges for the medically unnecessary ESWT also were fraudulent in that the Defendants did not even actually provide high energy ESWT that satisfied the requirements of CPT code 0101T.

214.     Instead, the Defendants actually provided Radial Pressure Wave Therapy.

215.     Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave.

216.     Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

217.     In fact, the Defendants utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave.

218.     Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – Defendants did not even provide the high energy ESWT treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed using CPT code 0101T.

219.     Furthermore, the Defendants routinely purported to directly treat a patient's spine despite the fact that, according to the user manual for the RPW machine utilized by RES, the machine is not intended for use on "any regions near large nerves, vessels, the spinal column or head."

220.     In short, the billing for ESWT treatments was part of the Defendants' fraudulent treatment and billing protocol, was designed to financially enrich the Defendants, and had nothing to do with genuine patient care.

**6.     The Fraudulent Charges for Trigger Point Injections**

221.    Based on the false, boilerplate diagnoses provided to virtually every Insured following the Defendants' fraudulent initial examinations and follow-up examinations, Strut and RES subjected many Insureds to a series of medically unnecessary trigger point injections, usually on the same date as a purported follow-up examination.

222.    The sole purpose of these medically unnecessary injections was to enrich the Defendants as the injections were performed regardless of the Insureds' symptoms or complaints.

223.    Defendants then typically billed the trigger point injections under CPT codes 20550, 20551, 20552, or 20553, generally resulting in charges of $95.19 and $105.42 for each round of trigger point injections that they purported to provide.

224.    Like the Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

225.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located.  Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

226.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point.  Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

227.    Any legitimate trigger point treatment should begin with conservative therapies such as active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

228.    In a legitimate trigger point treatment, trigger point injections should typically not be administered until after a patient has had the opportunity to fail conservative management.

229.    To increase the amount of fraudulent billing they could submit to GEICO and other insurers, Defendants routinely submitted a separate charge of between $173.52 and $289.20, under CPT code 76942, for supposed "ultrasound guidance" used in the provision of the medically unnecessary trigger point injections.

230.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a predetermined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

231.    In fact, in a legitimate clinical setting, trigger point injections may be provided in an office setting, and generally do not require the use of ultrasound guidance.

232.    Even so, in order to maximize the amount of billing they could cause to be submitted to GEICO, Defendants virtually always purported to provide trigger point injections using ultrasound guidance.

**7.     The Fraudulent Charges for "Prolotherapy" Injections**

233.    Based on the false, boilerplate diagnoses provided to virtually every Insured following the Defendants' fraudulent initial examinations and follow-up examinations, Strut and RES subjected most Insureds to a series of medically-useless prolotherapy injections.

234.    Strut purported to personally perform virtually all of the purported prolotherapy injections in the claims identified in Exhibit "1", which Strut and RES then billed to GEICO under CPT codes 20550 and 20551, typically resulting in thousands of dollars in charges per Insured.

235.    Prolotherapy, also known as "proliferation therapy", "regenerative injection therapy", or "proliferative injection therapy", involves injecting an otherwise non-pharmacological and non-active irritant solution into the body, generally in the region of tendons or ligaments, for the purpose of strengthening weakened connective tissue and alleviating musculoskeletal pain.

236.    Legitimate peer-reviewed literature does not substantiate the value of prolotherapy and, indeed, prolotherapy injections have not been proven to be any more effective than placebo injections.

237.    CMS has determined that the medical effectiveness of prolotherapy has not been verified by scientifically controlled studies, and that reimbursement for prolotherapy should be denied on the ground that it is not reasonable and necessary.

238.    In keeping with the fact that prolotherapy is medically unnecessary, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") lists prolotherapy among its unproven drugs, devices or medical treatment or procedures that are excluded from CHAMPUS benefits. See 32 C.F.R. 199.4.

239.    Strut and RES's charges for prolotherapy were fraudulent in that the prolotherapy was medically-useless, and was performed – to the extent that it was performed at all – pursuant to a predetermined fraudulent protocol designed to maximize the billing that the Defendants could submit or cause to be submitted to GEICO, not to benefit the Insureds who were subjected to it.

240.    To further increase the fraudulent billing that they could submit for each medically-unnecessary prolotherapy session, Strut and RES routinely submitted a separate charge of $211.32, under CPT code 76942, for "ultrasound guidance" of the prolotherapy injections.

241.    The charges for "ultrasound guidance" of the prolotherapy injections were fraudulent inasmuch as, like the underlying prolotherapy itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a predetermined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who were subjected to it.

242.    The charges for "ultrasound guidance" of the prolotherapy injections also were fraudulent in that they misrepresented the nature and extent of the service that allegedly was performed. Specifically, the use of CPT code 76942 to bill for "ultrasound guidance" represented that Strut obtained permanent recorded images of the site to be localized, and maintained a thorough, documented description of the localization process either separately or within the report of the underlying prolotherapy procedure.

243.    Though Strut and RES routinely billed for "ultrasound guidance" of prolotherapy injections under CPT code 76942, in most cases Strut and RES did not obtain permanent recorded images of the site to be localized to support the charges under CPT code 76942, and did not maintain a thorough, documented description of the localization process either separately or within the prolotherapy reports.

244.    Even if there were some medical use for the prolotherapy injections that Strut and RES purported to provide – and there was not – the specific prolotherapy injection sites should vary considerably from patient-to-patient, depending on each patient's individual symptoms and presentation. Even if every patient in a discrete cohort presents with some cervical or lumbar back

pain arising from an automobile accident, the specific injection locations in the cervical or lumbar spine should vary to a meaningful degree amongst the patients, inasmuch as it is extremely unlikely that every patient within the cohort will present with pain arising from the same tendon or ligament areas.

245.    However – and in keeping with the fact that Strut and RES's prolotherapy injections were not medically necessary, and instead were provided on an assembly-line basis without regard for each Insured's individual circumstances – Strut and RES purported to provide prolotherapy injections to the same parts of virtually every Insured's body.

246.    Specifically, Strut purported to inject some combination of the following 37 spinal injection sites—and often all of them—in virtually every claim for prolotherapy injections identified in Exhibit "1":

(i)      "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L2 on the right CPT code 20551 1 unit"

(ii)     "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L3 on the right CPT code 20551 1 unit"

(iii)    "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L4 on the right CPT code 20551 1 unit"

(iv)     "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L5 on the right CPT code 20551 1 unit"

(v)      "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L2 on the left CPT code 20551 1 unit"

(vi)     "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L3 on the left CPT code 20551 1 unit"

(vii)   "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L4 on the left CPT code 20551 1 unit"

(viii)   "Perifacet area of transverse process of Vertebrae at attachment of multitude (intrasegmental lumbar spine stabilizers) muscles . . L5 on the left CPT code 20551 1 unit"

(ix)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L2 on the right CPT code 20551 1 unit"

(x)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L3 on the right CPT code 20551 1 unit"

(xi)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L4 on the right CPT code 20551 1 unit"

(xii)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L5 on the right CPT code 20551 1 unit"

(xiii)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L2 on the left CPT code 20551 1 unit"

(xiv)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L3 on the left CPT code 20551 1 unit"

(xv)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L4 on the left CPT code 20551 1 unit"

(xvi)   "Tip of transvers process of vertebrae at attachment of multiple paraspinal muscles including but not limited to iliocostalis, longissius and spinalis L5 on the left CPT code 20551 1 unit"

(xvii)   "Inter and Intra-spinous Ligaments L1-L2 at attachment of multiple paraspinal muscles included but not limited to iliocostalis, longissimus and spinalis CPT code 20551 1 unit"

(xviii) "Inter and Intra-spinous Ligaments L2-L3 at attachment of multiple paraspinal muscles included but not limited to iliocostalis, longissimus and spinalis CPT code 20551 1 unit"

(xix) "Inter and Intra-spinous Ligaments L3-L4 at attachment of multiple paraspinal muscles included but not limited to iliocostalis, longissimus and spinalis CPT code 20551 1 unit"

(xx) "Inter and Intra-spinous Ligaments L4-L5 at attachment of multiple paraspinal muscles included but not limited to iliocostalis, longissimus and spinalis CPT code 20551 1 unit"

(xxi) "Inter and Intra-spinous Ligaments L5-S1 at attachment of multiple paraspinal muscles included but not limited to iliocostalis, longissimus and spinalis CPT code 20551 1 unit"

(xxii) "SI joint at Hackett point A on the right at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxiii) "SI joint at Hackett point B on the right at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxiv) "SI joint at Hackett point C on the right at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxv) "SI joint at Hackett point D on the right at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxvi) "Tip of PSIS at attachment of sacrotuberous ligament on the rightCPT [sic] code 20550 1 unit"

(xxvii) "Inferior pole of PSIS at attachment of sacrotuberous ligament on the right CPT code 20550 1 unit"

(xxviii) "SI joint at Hackett point A on the left at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxix) "SI joint at Hackett point B on the left at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxx) "SI joint at Hackett point C on the left at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxxi) "SI joint at Hackett point D on the left at different points of posterior sacrospinous ligament CPT code 20550 1 unit"

(xxxii) "Tip of PSIS at attachment of sacrotuberous ligament on the left CPT code 205501 1 unit"

(xxxiii) "Inferior pole of PSIS at attachment of sacrotuberous ligament on the left CPT code 20550 1 unit"

(xxxiv) "Superior Borders of Iliac Crest at attachment of Gluteus Maximums to the right CPT code 20551 1 unit"

(xxxv) "Superior Borders of Iliac Crest at attachment of Gluteus Maximums to the left CPT code 20551 1 unit"

(xxxvi) "Ilio-lumbar Ligament on the right CPT code 20550 1 unit"

(xxxvii)      "Ilio-lumbar Ligament on the left CPT code 20550 1 unit"

247.    Moreover, in a legitimate clinical setting, even legitimate pain management injections should not be administered before a patient tries and fails more conservative forms of treatment, including chiropractic treatment and physical therapy.

248.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in more conservative forms of treatment.

249.    Furthermore, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

250.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more

serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

251. However, in the claims for prolotherapy injections identified in Exhibit "1", Strut routinely purported to administer an extremely large number of prolotherapy injections to Insureds within a span of weeks, despite the fact that such a regimen not only was medically unnecessary, but also placed the Insureds at risk.

252. For example:

(i) On June 20, 2021, an Insured named LO was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to LO on November 12, 2021, December 15, 2021, February 15, 2022, March 16, 2022, and April 15, 2022.

(ii) On September 12, 2022, an Insured named CF was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to CF on November 15, 2022, December 15, 2022, January 3, 2023, January 17, 2023, February 1, 2023, February 15, 2023, March 1, 2023, March 22, 2023, April 18, 2023, May 16, 2023, June 14, 2023, July 11, 2023, and August 8, 2023.

(iii) On July 17, 2021, an Insured named DB was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to DB on March 22, 2022, April 12, 2022, May 20, 2022, June 17, 2022, August 18, 2022, September 22, 2022, October 31, 2022, and November 23, 2022.

(iv) On July 21, 2021, an Insured named BR was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to BR on April 1, 2022, April 27, 2022, May 26, 2022, July 26, 2022, August 30, 2022, September 27, 2022, November 21, 2022, December 21, 2022, January 20, 2023, February 17, 2023, and March 17, 2023.

(v) On February 8, 2022, an Insured named CH was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to CH on October 18, 2022, December 2, 2022, February 3, 2023, March 3, 2023, April 26, 2023, June 2, 2023, July 7, 2023, and August 4, 2023.

(vi) On May 1, 2022, an Insured named FO was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to FO on December 29, 2022, January 25, 2023, February 8, 2023,

February 22, 2023, March 22, 2023, May 23, 2023, June 21, 2023, and August 1, 2023.

(vii)   On December 22, 2021, an Insured named DC was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to DC on March 4, 2022, March 18, 2022, April 19, 2022, May 10, 2022, June 7, 2022, August 2, 2022, January 6, 2023, February 7, 2023, and March 21, 2023.

(viii)  On September 2, 2022, an Insured named CN was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to CN on January 18, 2023, February 3, 2023, February 22, 2023, March 7, 2023, March 31, 2023, April 18, 2023, May 15, 2023, June 14, 2023, August 9, 2023, and September 6, 2023.

(ix)    On April 28, 2022, an Insured named BD was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to BD on November 15, 2022, December 7, 2022, January 11, 2023, February 16, 2023, March 14, 2023, April 7, 2023, May 15, 2023, September 5, 2023, and October 10, 2023.

(x)     On May 5, 2022, an Insured named AD was involved in an automobile accident. Strut and RES subsequently purported to provide a large number of prolotherapy injections to AD on October 19, 2022, December 2, 2022, January 5, 2023, February 3, 2023, March 3, 2023, March 16, 2023, April 11, 2023, April 25, 2023, May 17, 2023, August 2, 2023, and August 30, 2023.

253.    Strut and RES's predetermined treatment protocol – including subjecting Insureds to a large amount of medically unnecessary prolotherapy injections over the course of a several weeks – was designed and employed by Strut and RES solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**8.    The Fraudulent Charges for "Pain Fiber" Tests**

254.    Based upon the fraudulent, predetermined "diagnoses" that the Defendants provided during the initial examinations and follow-up examinations, Strut and RES purported to subject most Insureds in the claims identified in Exhibit "1" to a series of medically useless "pain fiber nerve conduction study" or "pf-NCS" tests.

255.    Strut purported to personally perform virtually all of the pf-NCS tests in the claims identified in Exhibit "1", which Strut and RES then billed to GEICO under CPT code 95913, typically resulting in a charge of $525.96 for each round of pf-NCS testing that each Insured purportedly received.

### a.    Legitimate Tools for Neuropathy Diagnosis

256.    Strut and RES supposedly provided the pf-NCS tests to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

257.    There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for establishing the diagnosis of abnormalities (i.e., neuropathies) in the peripheral nerves and the nerve roots (i.e., radiculopathies). These diagnostic tests are nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, and magnetic resonance imaging tests ("MRIs").

258.    Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

259.    If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

260.    MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

**b.       The Medically-Useless pf-NCS Tests**

261.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

262.     The pf-NCS test is a supposed non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

263.     Pf-NCS tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. Supposed "findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

264.     In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in pf-NCS testing.

265.     If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it supposedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it supposedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

266.    The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The pf-NCS tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

267.    Though Strut and RES purported to subject many Insureds to pf-NCS tests, supposedly to diagnose radiculopathies, the pf-NCS tests were medically useless because virtually every Insured who purportedly was subjected to the pf-NCS tests by Strut and RES also received, at or about the same time, NCVs, EMGs, and/or MRIs.

268.    Even if the pf-NCS tests purportedly provided by Strut and RES had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and/or MRIs that the Insureds received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the pf-NCS tests that Strut and RES purported to provide.

269.    For example:

(i)      On August 3, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named AL, despite the fact that AL already had received MRIs.

(ii)     On March 2, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named AD, despite the fact that AD already had received MRIs.

(iii)    On July 6, 2023 and August 3, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named NR, despite the fact that NR already had received MRIs.

(iv)     On August 4, 2022, Strut and RES purported to provide pf-NCS tests to an Insured named LR, despite the fact that LR already had received MRIs.

(v)      On July 6, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named AC, despite the fact that AC already had received MRIs.

(vi)    On September 2, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named AA, despite the fact that AA already had received MRIs.

(vii)   On May 4, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named BB, despite the fact that BB already had received MRIs.

(viii)  On December 1, 2022, Strut and RES purported to provide pf-NCS tests to an Insured named BB, despite the fact that BB already had received MRIs.

(ix)    On September 2, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named MC, despite the fact that MC already had received MRIs.

(x)     On June 3, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named CD, despite the fact that CD already had received MRIs.

(xi)    On September 7, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named AD, despite the fact that AD already had received MRIs.

(xii)   On August 4, 2022, Strut and RES purported to provide pf-NCS tests to an Insured named MF, despite the fact that MF already had received MRIs.

(xiii)  On October 5, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named KG, despite the fact that KG already had received MRIs.

(xiv)   On October 6, 2022, Strut and RES purported to provide pf-NCS tests to an Insured named MG, despite the fact that MG already had received MRIs.

(xv)    On December 21, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named TH, despite the fact that TH already had received MRIs.

(xvi)   On July 1, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named RH, despite the fact that RH already had received MRIs.

(xvii)  On November 4, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named AH, despite the fact that AH already had received MRIs.

(xviii) September 17, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named AJ, despite the fact that AJ already had received MRIs.

(xix)   July 6, 2023, Strut and RES purported to provide pf-NCS tests to an Insured named BJ, despite the fact that BJ already had received MRIs.

(xx)    On September 17, 2021, Strut and RES purported to provide pf-NCS tests to an Insured named KL, despite the fact that KL already had received MRIs.

270.    Under the circumstances in which they were employed by Strut and RES, the purported pf-NCS tests constituted a purposeful and unnecessary duplication of the MRIs and/or NCV tests/EMG tests that the Insureds virtually always supposedly received contemporaneously with the pf-NCS tests, and in many cases before the pf-NCS tests.

271.    Even assuming that there was some diagnostic value for pf-NCS tests, the pf-NCS tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

272.    In any case, there are no legitimate data to support the use of pf-NCS tests to diagnose neuropathies in general or radiculopathies in particular.

273.    There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a pf-NCS device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal pf-NCS results are or are not abnormal.

274.    Even if there were some evidence of the existence of normal ranges of intensity required to evoke a sensation using a pf-NCS device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a hypoesthetic condition or that sensation threshold less than the normal range would indicate a hyperesthetic condition.

275.    Even if an abnormal sensation threshold indicated either a hypoesthetic or hyperesthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from pf-NCS tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

276.    Furthermore, even if pf-NCS tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    pf-NCS do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)     there would be no legitimate diagnostic advantage to using pf-NCS tests to obtain information regarding the sensory nerve fibers where, as here, the pf-NCS tests were duplicative of contemporaneously-provided MRIs and/or NCV/EMG tests.

277.    In keeping with the fact that Strut and RES's purported pf-NCS tests were medically useless, CMS has issued a National Coverage Determination that pf-NCS tests are not medically reasonable and necessary for diagnosing sensory neuropathies and radiculopathies, and are therefore not compensable.

278.    In keeping with the fact that Strut and RES's putative pf-NCS were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for pf-NCS tests.

279.    In keeping with the fact that Strut and RES's purported pf-NCS tests were medically useless, the putative "results" of the Defendants' pf-NCS tests were not incorporated into any Insured's treatment plan, and the pf-NCS tests played no genuine role in the treatment or care of the Insureds.

**c.    Each of the Two Main pf-NCS Test Device Manufacturers Claims the Other is a Fraud**

280.    In keeping with the fact that Strut and RES's purported pf-NCS tests were medically useless, the putative "results" of the Defendants' pf-NCS tests were not incorporated into any Insured's treatment plan, and the pf-NCS tests played no genuine role in the treatment or care of the Insureds.

281.    Until 2004, about the same time that CMS was considering the medical benefits of pf-NCS testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of pf-NCS tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

282.    Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold.

283.    In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

284.    Neuro Diagnostic Associates, Inc.'s last known business address and telephone number are identical to those used by PainDx, Inc. Moreover, the technical specifications of the Medi-Dx 7000 are virtually identical to the Axon-II.

285.    To the extent that Strut and RES provided pf-NCS tests to Insureds, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

286.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-

Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

287.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

288.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000 that was used by Strut and RES.

**d.    The Fraudulent pf-NCS Test "Reports"**

289.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000 that was used by Strut and RES.

290.    In support of their fraudulent charges for the pf-NCS tests, Strut and RES submitted false pf-NCS test "reports" which falsely represented that Strut had some role in performing and interpreting the tests.

291.    Strut and RES's bills for the pf-NCS tests likewise falsely represented that Strut had some role in performing and interpreting the tests.

292.     In actuality, to the extent that the pf-NCS tests were performed in the first instance, they were performed by technicians who were associated with RES, and Strut had no role whatsoever in performing the tests or interpreting the test results.

293.     In keeping with the fact that the pf-NCS tests were performed – to the extent that they were performed at all – by technicians, rather than by a licensed physician who actually interpreted the supposed test results, the putative test "reports" did not contain any genuine interpretation of the test data.

294.     Instead, aside from reporting the putative pf-NCS data that supposedly were derived from the respective Insureds' tests, the boilerplate pf-NCS test "reports" each contained identical, boilerplate "Diagnostic Discussion" sections, computer-generated "Results" sections, and boilerplate "Recommendations/Conclusions" sections that did not vary to any significant extent from patient-to-patient and were included solely to foster the illusion that a licensed physician had some role in performing or interpreting the tests.

295.     For instance, virtually all of Strut and RES's purported pf-NCS test reports contained the following, identical "Diagnostic Discussion" section:

> On the graph, the nerve with the highest amplitude is the injured nerve that the source of the patient's dysfunction. As a result of spinal cord interconnectivity, sensory pathology influences conduction in adjacent nerves so adjacent nerves will also show higher amplitudes. However, the highest amplitude is the injured nerve.
>
> Below normal amplitudes correlate with irritation and may suggest possible adjacent inflammatory activity, which may warrant investigation to rule in/rule out concomitant pathology. However, it is not uncommon to find irritation adjacent to the injured nerve.
>
> The uninjured side will mirror the injured side very closely in an acute injury. However, in the case of chronic pain, the uninjured side will no longer mirror and will be closer to the normal range due to disinhibition of nerve signals over time.
>
> Normal findings do not rule out non-neurogenic etiologies. For example, if the results do not indicate any neurological involvement then the doctor can be confident that the source of the patient's pain can be narrowed to the other structures that are commonly injured

following cervical trauma. This would most commonly include the muscles and ligamentous structures.

296.   What is more, virtually all of Strut and RES's purported pf-NCS test reports contained the following, substantially identical "Recommendations/Conclusions" section, to the point where the "Recommendations/Conclusions" were set forth using the same idiosyncratic grammar and style:

> Based on the results of this testing diagnosis of … radiculopathy is suspected. I will schedule patient for intersegmental needle EMG targeting multifidi muscles to confirm this pathology. EMG is a very painful test and pf-NCS will limit the amount of needle sticks that the patient requires during EMG. I will only test level(s) of question and peripheral muscles these nerve roots innervate.  I discussed with patient possibility of trial diagnostic peripheral blocks at the associated level(s) listed in the impression since this procedure will be therapeutic as well. I also discussed with patient the possibility of trial of intra-ligamentous injections in order to improve structural integrity of the [cervical or lumbosacral] spine and promote recovery. I counseled patient on risk factors and complications associated with these type of procedures. Patient stated that they need time to think about provided information and let me know decision on the next visit. This test also will help me to direct patient's manipulative treatment and I will provide the treating chiropractor with more detailed direction on what segment(s) to concentrate care.

297.   In fact, the purported "results" of the pf-NCS tests had no affect whatsoever on any Insured's treatment plan, in keeping with the fact that pf-NCS tests are a sham that have no actual diagnostic value with respect to neuropathies or radiculopathies.

298.   Other than the boilerplate "Diagnostic Discussion" and "Recommendations/Conclusions" sections of the purported pf-NCS test reports, the reports did not contain any interpretation of the data that Strut and RES purported to obtain from the tests.

299.   Strut and RES billed for the pf-NCS tests as if they were performed by a licensed physician who legitimately interpreted the test data in order to make it appear as if the services were eligible for reimbursement, when in fact they were medically useless tests that were not legitimately performed or interpreted by a licensed physician in any manner. Strut and RES's

misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

e.    **The Fraudulent "Radiculopathy" Diagnoses**

300.    According to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the American Association of Neuromuscular and Electrodiagnostic Medicine, radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims.

301.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore most likely represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

302.    Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

303.    Even so, Strut and RES falsely purported to use their pf-NCS tests to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received pf-NCS testing at RES.

304.    Strut and RES purported to arrive at their predetermined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants, including follow-up examinations, psychological testing, drug screening, trigger point injections, prolotherapy injections, electrodiagnostic testing, and related services.

305.     In fact, pf-NCS tests cannot legitimately be used to diagnose radiculopathies in the first instance.

**9.      The Medically Unnecessary Drugs and the Fraudulent Charges for Drug Screens**

306.     As part and parcel of their fraudulent treatment and billing protocol, the Defendants provided Insureds with a large number of prescriptions for medically unnecessary narcotics and other habit-forming drugs.

307.     The Defendants provided Insureds with a large number of prescriptions for medically unnecessary narcotics and habit-forming drugs for two reasons: (i) to incentivize the Insureds to continue to report to RES for the medically unnecessary Fraudulent Services; and (ii) to create a false basis to fraudulently bill for a massive amount of medically unnecessary drug screens.

**a.      The Medically Unnecessary Drugs**

308.     In a legitimate clinical setting, narcotics and habit-forming drugs are generally not considered as a first-line treatment for acute back or neck pain. This is because: (i) opioid and habit-forming drugs carry the risk of dependency, overdose, or death that are absent in more conservative forms of treatment; (ii) opioids and habit-forming drugs can impair a patient's ability to function in the world more than more conservative treatments, and more than the underlying pain, itself; (iii) the data do not demonstrate that opioids and habit-forming drugs are much more effective than other types of analgesics, such as NSAIDs, which have a lower risk profile; and (iv) and overutilization of narcotics and habit-forming drugs involves societal risks, including the risk of drug diversion.

309.     In the event that a patient suffers from chronic back or neck pain, which itself would be rare in the context of a soft tissue injury arising from an automobile accident, the physician may

consider initiating a short-term trial of opioid analgesics. However, long-term use of narcotics and other habit-forming drugs to treat chronic back or neck pain generally is not the legitimate standard of care.

310.    Even so, in the claims identified in Exhibit "1", the Defendants routinely prescribed a large amount of narcotics and other habit-forming drugs to Insureds, or caused them to be prescribed to Insureds, despite the fact that the Insureds did not, and could not have, sustained any injuries in their automobile accidents that would warrant the large amount of prescriptions.

311.    The Defendants prescribed these medically unnecessary drugs to Insureds, or caused them to be prescribed, in order to incentivize the Insureds to continue to report to RES for additional, medically unnecessary Fraudulent Services, and in order to create a false basis to fraudulently bill for a massive amount of medically unnecessary drug screens.

**b.      The Fraudulent Charges for Drug Screens**

312.    As set forth in Exhibit "1", the Defendants billed for the drug screens using CPT codes 80307 and 80377, typically resulting in hundreds of dollars in drug screening charges per Insured.

313.    The Defendants purported to provide most Insureds in the claims identified in Exhibit "1" with an initial set of drug screens during their purported initial examinations, ostensibly in order to determine whether the Insureds had any preexisting drug problems that would militate against the substantial amount of narcotics and other habit-forming drugs that the Defendants prescribed or caused to be prescribed.

314.    Then, during subsequent purported follow-up examinations, the Defendants purported to provide most of the Insureds with additional drug screens, ostensibly in order to determine whether the Insureds were taking their prescribed drugs, whether the Insureds were

diverting their prescribed drugs, and whether the Insureds were taking any unprescribed or illicit substances that would militate against the substantial amount of narcotics and other habit-forming drugs that the Defendants prescribed or caused to be prescribed.

315.    In fact, the Defendants' charges for the drug screens were fraudulent, in that the drug screens – like the drugs that the Defendants prescribed – were medically unnecessary. In the claims identified in Exhibit "1", the Insureds almost never presented with any problems that legitimately required prescriptions for narcotics or other habit-forming drugs. Nor, by extension, did the Insureds require drug screens.

316.    What is more – and as set forth above – to the extent that the Insureds' drug screen results indicated that the Insureds had drug problems, or were diverting their prescriptions, or were not taking their drugs as prescribed, the Defendants often simply ignored the results of the drug screens and prescribed additional narcotics and other habit-forming drugs to the Insureds.

317.    Furthermore, in the claims identified in Exhibit "1", the Defendants virtually always submitted billing to GEICO for two separate sets of drug screens that were administered by the Defendants to a single Insured on a single date of service.

318.    The first set of drug screens were billed to GEICO under CPT code 80307 in the amount of $31.80. The second set of drug screens were billed to GEICO under CPT code 80377 in the amount of $91.71.

319.    In a legitimate clinical setting involving the prescription of narcotics or other habit-forming drugs, best practices involve presumptive testing with confirmation of unexpected positive or negatives using definitive testing.

320.    Ostensibly, the Defendants purported to administer a second set of drug screens to the Insureds in order to confirm the results of the first set of drug screens that the Defendants administered to those same Insureds on the same date of service.

321.    In actuality, though the Defendants ostensibly provided second sets of drug screens in order to confirm the results of the other drug screens that the Defendants contemporaneously provided, the "confirmatory" or "definitive" screens did not provide any meaningful information beyond what the Defendants already had obtained from the initial set of drug screens that they provided to Insureds. What is more, the Defendants routinely provided a second round of "definitive" testing regardless of whether there were any unexpected positives or negatives in the initial "presumptive" testing. Furthermore, and in any case, the Defendants often simply ignored the results of the drug screens, and continued to prescribe narcotics and other habit-forming drugs to the Insureds despite clear indications that the Insureds had drug problems or were diverting the drugs.

322.    Furthermore, in keeping with the fraudulent nature of Defendants' drug screen protocol, the Defendants routinely submitted billing for drug screens performed on patients who were deemed low-risk according to the Opioid Risk Tool administered by Defendants and who were not being considered for opioid treatment or the prescription of other habit-forming drugs.

**10.    The Fraudulent Charges for Outcome Assessment Tests**

323.    In addition to the other Fraudulent Services, the Defendants purported to subject Insureds to medically useless "outcome assessment tests," generally on the same dates when they purported to subject the Insureds to initial or follow-up examinations.

324.    The Defendants billed the "outcome assessment tests" through RES to GEICO under CPT codes 99358 and 99354, generally resulting in charges of either $225.25 or $235.54 for each round of purported testing.

325.    Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were designed to maximize the Defendants' fraudulent billing, not to treat or otherwise benefit the Insureds who supposedly were subjected to the tests.

326.    The "outcome assessment tests" that the Defendants purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives. The Insureds' responses to the questionnaires then were fed into a computer, which automatically generated a report that rated the Insureds' responses according to pre-set criteria.

327.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up evaluations, and since the "outcome assessment tests" that the Defendants purported to provide were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial examinations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, and then bill separately for contemporaneously-provided "outcome assessment tests."

328.    The information gained through the use of the "outcome assessment tests" that the Defendants purported to provide was not significantly different from the information that the

Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.

329.    Under the circumstances employed by the Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories purportedly conducted during each Insured's initial examination and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a predetermined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

330.    The Defendants' use of CPT codes 99358 and 99354 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT codes 99358 and 99354 represents – among other things – that a physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

331.    Though the Defendants routinely submitted billing for the "outcome assessment tests" under CPT codes 99358 and 99354, no physician associated with RES spent an hour reviewing or administering the tests, or any time at all, and the putative "results" of the tests were not incorporated into any Insured's treatment plan.

III.    **The Fraudulent Billing the Defendants Submitted to GEICO**

332.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through RES to

GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

333.    The HCFA-1500 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    In many cases, the HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the RES was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, RES was not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by RES's employees

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

334.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

335.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

336.    Specifically, they knowingly misrepresented and concealed facts related to RES in order to prevent GEICO from discovering that the Fraudulent Services were medically

unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

337.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

338.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

339.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

340.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,603,000.00 based upon the fraudulent charges.

341.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against RES
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

342. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-341, above.

343. There is an actual case in controversy between GEICO and RES regarding more than $75,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

344. RES has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

345. RES has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

346. RES has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

347. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that RES has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Strut
### (Violation of RICO, 18 U.S.C. § 1962(c))

348. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-341, above.

349.    RES is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

350.    Strut knowingly conducted and/or participated, directly or indirectly, in the conduct of RES's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that RES was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary, were performed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (ii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

351.    RES's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Strut operated RES, inasmuch as RES never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for RES to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO through RES and attempt collection on the fraudulent billing to the present day.

352.     RES is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by RES in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

353.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,603,000.00 pursuant to the fraudulent bills submitted through RES.

354.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Strut and Bauers**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

355.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-341, above.

356.     RES is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

357.     Strut and Bauers are employed by and/or associated with RES.

358.     Strut and Bauers knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the RES's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that RES was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary,

were performed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; and (ii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

359.    Strut and Bauers knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

360.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,603,000.00 pursuant to the fraudulent bills submitted through the RES.

361.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against all Defendants**
**(Common Law Fraud)**

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-341, above.

363.    RES, Strut, and Bauers intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

364.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (ii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted.

365.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RES that were not compensable under the No-Fault Laws.

366.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,603,000.00 pursuant to the fraudulent bills submitted by the Defendants through RES.

367.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

368.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against all Defendants**
**(Unjust Enrichment)**

369.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-341, above.

370.    As set forth above, RES, Strut, and Bauers have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

371.    When GEICO paid the bills and charges submitted by or on behalf of RES for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

372.    RES, Strut, and Bauers have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

373.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

374.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,603,000.00.

## JURY DEMAND

375.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against RES, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that RES has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Strut, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,603,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Strut and Bauers, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,603,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against RES, Strut, and Bauers, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,603,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against RES, Strut, and Bauers, more than $1,603,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated: June 11, 2024

RIVKIN RADLER LLP


By:   _/s/ Barry I. Levy_____
        Barry I. Levy, Esq.
        Joshua D. Smith, Esq.
        Max Gershenoff, Esq.(to be admitted *pro hac vice*)
        926 RXR Plaza
        Uniondale, New York 11556
        (516) 357-3000
        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*